321-0470, People of the City of Illinois, Ambulance Drive, Thomas Dorado, v. Pan, Pan, Main Ms. Main, you may proceed. Yes, right here to the podium. Good morning. Wait, is this still morning? Yes, it is. My name is Connie Main, and I am not an attorney, but I am a degree professional. And I had always abided by the laws and had a clean, clear legal record up to nearly 60 years old until May 7th of 2020. On May 7th of 2020, actually it was two days before that, I feel like you should know a little bit about the case in order to understand how it all arose and what went from there. But on May 5th of 2020, a business professional arrived at my country residence, believing, well, we didn't know what it was, but he left, and when he left he made a noise disturbance. He came back two days later, and this time my husband and I, we have home surveillance video with sound, and we noticed him coming, so we thought we would go outside maybe to see what he wanted, should he appear to stop like he did two days previously. Upon doing that, he did stop. He pulled into our, you know, gated off drive entry that we had to gate off because we had been reporting for at least three years prior to that a bunch of abuses and harassment directed toward us at our house in the country, our private residence. So on the second day that he arrived, and we did go out front, and he exited his vehicle. This was at the height of COVID when children were possibly home alone, and he had no mask, and we were, you know, not from how far, we're 100 feet from the road, and we, I yelled, you know, what do you want? And he just points aggressively with an angry face. For me, it looks like an angry face, and he throws out a name, Hopping, who is one of our neighbors that we have had trouble with in the past and had to report to law enforcement over previous years, and there's a little more history to that because this man kept saying, what do you want? He just, Hopping, no, what do you want? I just need to know where they live. He would make statements that he expected us to answer for him. He wanted us to tell him where his job site was. He was a professional looking for the Hopping house to do a job. And what was his occupation? He is a electrical. Yeah, it says on the side of his hand, V&M Mechanical Services, and I believe he does sewer and electrical, it says on the van. V&M Electrical. This was your second encounter with him? Yes. And all kinds of discussion the first time? No, no. He left, and it was a noise disturbance desk. We've had lots of noise disturbances, revving with his vehicle. So on approach, he comes up real fast, and he slows to a near stop, and then they kind of punch the accelerator and depart. Some are really worse than that, and there's lots of variations of other types of abuses. So at any rate, to us, it's a noise disturbance because we've had so many, and that's the presentation. And we are only one of three houses on a two mile run, two to two and a half mile run. So we're sandwiched in between on this straight run country road, one house to our south and one house to our north. And to get to our home, I always say to everyone, you have to zigzag to get to our home. So there's an effort being made to get to our house if you're not supposed to be there, and you're not a regular in the area that lives in the area. But yet, our roads are all marked, every corner, all around us, in a five mile radius of us, the street corners are all marked. So at any rate, he kept insisting that we tell him where this household is. And prior to that, in 2018-19, we had a different, we had three other households actually, two other neighbors were farmers, but the other neighbors, most of our neighbors are new neighbors and they're not farmers. And they had, from 18-19, two of the households that are neighbors and one of the other households, their in-laws, sought emergency stalking orders on us. And we lost our weapons immediately, we were not asked our side, that's how emergency stalking orders work, and they were frivolous and unfounded, and that was it. We weren't able to prove on that one either that we were innocent, that this was hocus, because we were accused after we had, again, reported dogs that were illegal and attacking us while we were trying to perform our livelihood. So this came a year later, after we were off the stalking order and out of the blue. At any rate, we kept saying, you know, what do you want? And he kept wanting us to tell him where the hoppings were. I was very uncomfortable because we could be a third party telling him where to go to a house and be accused of sending strangers to these children because we'd already been accused of stalking other children and animals. So we didn't do it, and there were no threats. There was, I have to admit, one password, and it was in question format, and I have home surveillance video with sound, and it'll prove that. And so he left, and when he left, he immediately knew to turn right, and two days before when he came, he had turned left, which goes back to the interstate, or the highway that takes him back to his town, Gallagher, because he lived in a little village. It's a small little community, all of these little communities, Gallagher, where he lives and does his business. And the neighbor that he was supposed to do his job site at happens to have a business out of the same town that he runs his business from and lives. So at any rate, he left, when he left, and he went straight, he turned right, which requires another mile, and then he immediately turned right at the next T corner, T corner, he passed two other houses when he first turned right leaving ours without stopping to ask any of them where this household was, and we didn't tell him where it was, and then he turned right again and went another mile and a half and pulled straight into their driveway, the hoppings. And you ask me how I know? Because at that time of the year, we can look from our backyard through our fields, and we can see their house as they can see ours. The other thing is, all the neighbors in the area, none of our houses look the same. So, you know, we're farmers. They're not. We have farm buildings. We have different colored shutters. We have different colored mailboxes. We have some of us have decks or pools that others don't. Some have garages. We don't. So this man said he believed that our house was his job site. He didn't have an address because we asked him, don't you have an address? Didn't have an address. Didn't you do your GPS? I said, well, if they called you to do the job, why don't you call them? He refused to call. He just wanted us to send him to their house. So after he left, you know, we didn't think anything of it. So my husband and I decided to, we talked it out all day long because we had so many strange things, and we decided to try to call and thought we'd make a report of it. And we got nothing, really, from the police department. They never tell us anything. We have to FOIA to get anything. They won't ever get back to us whenever we report something or something happens. At any rate, 41 days later, I was warrant arrested when I was out in the community doing business at the city hall, unbeknownst that anything had occurred. Not one warrant arrest. I had three. Because the first one was this David Benson who came to my house looking for his business job site that he didn't have an address for. And there were two others. And the second was because when they were going to warrant arrest me that I knew nothing about, they sent it to me by certified mail. So when I finally got to the post office to try to pick it up, the letter had been intercepted by the deputy who was the arresting deputy. I never saw it ever, ever. Did I see it? So I don't know what was in it. But at any rate, I guess after I left there, the postal lady accused me of the same similar type of situation. So the deputy decided to warrant arrest me and didn't tell me about that. But in the day before that, we had gone to another property and a different neighbor whose dog was always attacking us. We had to report. She called. We called to report the dog and she called in. And so based on her allegations of her illegal dog that we supposedly cursed at her dog and yelled at it, the same deputy arrested me for all three warrant arrests. So my main argument and point that brings me here today is that my constitutional rights have been violated horribly as my due process. These are all officers of the law who are obligated to uphold the Constitution, people's rights and their due process and their equal protections to the law. And they have a duty to notify first, investigate first, investigate properly any allegations or any events that occur. Investigate is how it starts. It should start. Mine didn't for any of the three. They have a job to investigate. Then they are to notify. That's part of due process. Notify the person of the allegations that are against them so that they can get two sides of the story and it's not a witch hunt. You shouldn't be able to in America just go accuse somebody of a crime and they're arrested. Well, you can get an attorney, you know, and that's what the process is for. The judicial system is not meant to be used that way maliciously. So I was deprived of any kind of investigation, any kind of notice and any opportunity to appear first. I was seized from my home basically from David Benson showing up, not allowed to. Number one, if he thought my house was Mr. Hoppings, he was going to trespass. He would have trespassed and said, oh, it was a mistake. So I was denied the opportunity to ever feel free to protect my own property, to feel safe in my home, and I was seized from the street. Never once, with all three warrants, asked my side. These were all based on one side of accusations without a shred of proof. On the other hand, they know my history, all the officers of the law. They knew I had a clean criminal record. I never had parking tickets, speeding tickets, and guess what? I was darn lucky enough to have proof of all three. Yeah, I had proof of all three. And if they would have done proper investigations and if they would have collected all statements and all sides of the story from all parties involved, they would have seen that and I would have been persecuted, prosecuted, and convicted after my evidence of innocence was ignored, denied, suppressed, and manipulated. That exculpatory impeachment evidence that proves that these people, they perjured the sworn statement that is required by state law to generate a warrant for anyone's arrest. So I don't want to be here because I'm not an attorney, but because of these strange circumstances surrounding what's happened to me and happening, it's unexplainable why I can't get legal representation. So I'm here myself. But I can tell you this. These officers have a duty, all of them, starts from the deputies in the field. It goes up through my counsel that I had to fire because of misconduct. So my main argument, and let me start again, is that I have been convicted. It's been a malicious prosecution. There's been fraud on the court due to various officers of the law participating and allowing this to happen through misconduct, bias, improper procedures, and improper investigations. And in my brief, I know that it's called a legal record for a reason and not all things require a report of proceedings to prove. I did document, I will admit, that Mr. Arredo has been kind and that he didn't decide to strike my entire brief. He's allowing me to discuss those things that I documented that I can prove and that I cited and that I have statutes to support. And that's the fact that they have a duty, the deputy did, my counselor did, that I had to terminate services, the prosecutor did, and the judge did, that whenever they have any investigative material that negates someone's guilt, they are supposed to turn it over. My investigative, my exculpatory impeachment material, evidence of my innocence, 100% negates my guilt. Not, you know, 50% or 25%, 100% shows that I did not commit any of the crimes that my accusers accused me of. I know that you have my proof because it was submitted on an SD card for the S312 case. And whether you look at it alone or you compare it to the sworn statement of my accuser, you'll see that it 100% negates my guilt and that was suppressed and not turned over like it should be according to, for instance, Brady v. Maryland or Mahoney. I've got it here, the case sites. They're in my brief and it's Mahoney and Hallahan. They violated all their ethical and professional standards for licensure of an attorney with respect to specifically the ABA is, I think it's 3.8. Yeah, special responsibility of our prosecutor, the National District Attorney's Association for the prosecutor because, and they violated all my constitutional rights, freedom of speech, due process, equal protection by the law, impartial trial. Miss me? The red light means your time is up. In this part of your argument, you will have time to reply. Five minutes to reply so that you may reply to Mr. Arado's response. Okay, thank you. Sorry about that. No, that's fine. That's fine. Mr. Arado, you may respond. Please report. Good morning, your honors. Just distribution. Welcome to the court. The presentation of the facts in this case by his name was contained, perhaps within filings of her within court, but that is not proof of any of this. As an appellant, they have, she has a duty to provide a complete record on appeal, including the reports of proceedings, which supply the facts that were presented to the trial court and to the jury at the time of the trial. That was not done in this case. I assume there was a transcript of these? I've, no, appellant did not request any transcripts. Therefore, I have no idea whether there were any transcripts available or not. I mean, it's rule 323 requires that the appellant make that request to the court reporters to, as the first step. So, and then Fouch v. O'Brien, the Supreme Court, back in 1984, began saying that it's the appellant's duty to provide a complete record. So absent this, any, any statement of, even if there's an absence of a, of transcript reports of proceedings, a statement of facts or a bystander's report can be submitted to the court in lieu of a transcript. But that was not done in this case either. So we simply have no evidence in which to judge what happened in this case. As far as obligations, I am loath to respond to the appellant's arguments on the basis that there is no, there was no transcripts of hearings that took place on motions to dismiss. No transcripts to, as far as what the judge's reasoning was in denying these, whether any evidence was presented. But in the, in the interest of trying to explain, as far as I'm aware, there is no obligation on a police officer to actually go and talk to an alleged defendant prior to filing charges. In many instances, they, defendants rather object to being interviewed. But regardless, the appellant is filed, or cited, no authority that requires that. The only requirement is that when they go to seek a complaint, they file a complaint, they get a warrant under Section 107.9 of the Code of Criminal Procedure. You have to go before a judge and they swear out the warrant based upon the complaint that's filed. So there is due process. What is it they file, you say, a police officer? Police officer files the, a complaint was issued in this case. Who issues the complaint? Well, the state's attorney issues the complaint. But he asks, but the arrest warrant has to be sworn out. Presumably it was done in this case. Again, there's no record in which we can, can base that. Well, maybe you can enlighten the court what the process is. An officer receives some citizen complaint. Receives a citizen's complaint. Then investigates the merits of that complaint. Correct. And then what? Then they present, they can do one of two things. They can file, they can go to the court and file a sworn complaint and file that. Or they can go take the evidence or the information to the state's attorney's office, and the state's attorney can decide whether or not they're going to file a complaint or information or depending upon if it's an indictment presented to the grand jury. So what follows then? Then the swearing of the warrant under 107-9 is the next procedure. The judge has to learn what the facts are from the complainant, and then the officer can present that. It doesn't have to be the actual victim who presents, who comes and testifies for the judge. The judge simply has to be the officer saying to the judge, based upon my investigation, this is the information that I have, that a violation of whatever code section it is occurred, and then the judge says, okay, I agree, I will sign this warrant. And a $1,500, 10% to apply bond warrant was issued in this case. I'm under no, I'm unaware of any authority that an officer has to notify a defendant prior to getting the warrant. No, they have to interview a person subject to a complaint by someone else. There's no obligation to do that. All they need to do is find out information, and if there is sufficient probable cause to believe that a crime took place, they can take that either to issue a complaint or to take it to the state's jury to get them to follow through on it. We have no way of knowing. The SD card is in the record, but since there's no report of proceedings, we don't know which of the many files that are on that SD card were actually played or presented to the jury. There is a jury question that says, can we see this? But as Ms. Payne pointed out in her reply brief, we don't know which videos the jury looked at, or we have no idea what, so we don't know if there was any objection. We don't know if there was any denial of submitting those. We don't know whether the proper foundation was laid to present the videos. We know nothing because there's no report of proceedings about the trial and what the judge's rulings were. This court cannot actually physically look at the many files on that. If you go and look at that, there's also 1, 2, 3, 4, 5, I forget how many folders with exhibits 5, A, B, C, D. But I have no idea which one goes to which case because there's a list of exhibits, but those don't match up with what the numbers are on the SD card either. So even if you tried to match them up, I couldn't figure out which one goes to which. And of course, we don't know what was submitted because we don't have the trial transcripts. So your position is that there's an inadequate record for the court to review the affluence appeal? Correct. And that you cannot respond to it, is that correct? Essentially, yes, Your Honor. And what do you understand to be the law in that circumstance in terms of this dispute? When there's no report of proceedings or inadequate record, any doubts as to the absence of the record are construed against the appellant. So that's what this court is obligated to do under Fouch and all the other Long Island Supreme Court cases. Webster, I believe, is what we cite in the brief. Also, People v. Rocket that we cited for the proposition that if you don't have a report of proceedings, there's no ability to consider. And the consequences of that as well as your position. The consequences is that this court should affirm the judgment. They could even dismiss the appeal. We did not move to strike the second brief because this court took the motion to strike up with the first brief. However, we also did put in our brief that her brief fails to conform to 341H6 and H7 because the statement of facts contains no citations of any reports of proceedings, includes argument and exposition, which is inappropriate for a statement of facts. The arguments are, again, not including appropriate citations of the record, also inappropriate, well, conclusory allegations without any appropriate analysis. So based upon that, this court could strike the brief and dismiss the appeal. But we've simply asked the court to ignore those parts of the brief that are not compliant. So, I mean, there's – I also want to make one other point about the Brady material. It was – what is complained of by the appellant is material that she turned over to the state's attorney. That isn't Brady material. That's material that – and we cited a case that says the defendant is aware of materials. It's not subject to Brady. Brady is material that the state gets in possession, that they have a duty and obligation to turn over to the defendant. But if the defendant is the one that's turning over to the state as part of their discovery, the state doesn't have to turn around and give it back. It doesn't make any sense. So if the court has no other questions, we would respectfully ask this court to either affirm, dismiss, or however resolve it in favor of the state, and we will stand for the remainder of our brief. Any questions? No. Thank you, Mr. Roth. Ms. May, you may respond. Yes. I respectfully ask the court to really consider this because I want to say, first and foremost, with the statement of facts, I'll be frank. You know, I'm not an attorney, and the rules really aren't real clear for lay people. It's really confusing, and I admit, you know, there's a little bit of argument stuff in there. I realize now what that means, and maybe a little bit of – what was the other one you said I did? Argument and something leading or something. But at any rate, I do still have it set forth the way it should be, where it outlines the events, and I've aligned the documents to prove that event. So the document does reflect credible, factual, evidentiary material, okay? And I have to beg his pardon, but the prosecutor and everyone, there's a statute for a reason about discovery in criminal cases, and public investigative officers of the law at every level have an obligation by law to investigate and turn over any material that negates guilt. And it is a violation of Brady v. Maryland. Otherwise, what good is that law or that case site where they ruled? You know, what good does it do for a prosecutor to know somebody's innocent and convict just to convict and say, well, there you go. I'll give it back to you. Here we go. I'm going to convict you even though I know you're innocent. They have that. Mahoney and Brady say it again and again. It says clearly, if they have evidence of someone's innocence, they are supposed to provide that. It's called no well, nolly, nolly prosecute. Pardon the mispronunciation. Exactly. You know what? My husband was arrested with me, too. His was no well prosecuted. You know why? Because he gave the proof of his innocence to the attorney. The attorney gave it to the prosecutor, and they dismissed the case. There's bias and misconduct here, and I'm being punished, and this is fraud on the court. And they committed – it's a miscarriage of justice. I'm 100 percent innocent. And the records do reflect that, the common law record. There is no reported proceedings needed. You know why? Because the judge and the clerk documented what evidence was admitted. The testimony only of my accuser. So that's there, as well as the proof of what I submitted. And on my SD card, you can tell what's on there. Because I had to file a pretrial document saying what exhibits I wanted to try to introduce to court. And I have them each numbered. And if you go, it's clearly – every folder says what it is. I gave a sheet that tells exactly how many – I think I put how many pictures, how many were movies. I put it down to exact details and told the gigabytes and everything. And the judge was the one to call it – my SD card with all my – to match every exhibit I wanted to try to introduce, exhibit one. It looks like there's one exhibit. That's not true. There's many exhibits. And it also reflects the record without a reported proceeding that those jurors, one of them was impartial. It was a family through marriage related to the Hopping residence. Same last name. You'll see it on the list of jurors' names. That I tried to get off the jury, but they allowed, or she wouldn't have been sitting there. And that they didn't see, or it's possible they didn't see. I have to say I can't say they didn't see, but it's pretty probably certain they didn't see the right video. Because they sent a note out saying, what is this? And somebody, nobody signs anything, so you don't know, it could have been one of the jurors just writing that. And the other one said, it's an SD card with the video on it. And here's the jurors not knowing what it is, and they're supposed to figure out from all my evidence that I have on it that I wanted to admit to trial, which movie was the home surveillance video with sound of my innocence. Did you ask to show that in court? I tried, and the judge stopped me. But I'm sure you have no reported proceeding. But I wasn't allowed, so if they did see it, or even if they didn't, it would not have been viable, because it was after they were already in deliberation and had been instructed that they could not use it if it was presented to them after the court proceedings had finished. So even if they, you know, all they had to go on, if somebody said, look, you can't consider this, you can look at it. But the only testimony was Mr. Benson, oral testimony. And that should be in the common law record documented by the judge and his clerk that day. It should show oral testimony by David Benson and nothing else, because that's all there was. That's all that was allowed. Mrs. Mann, did you try to get a transcript made? I did not, because it is a legal record, and I approve. I shouldn't be there. I shouldn't be there. This was an ambush, trial by ambush. It was a miscarriage of justice, fraud on the court. Well, you filed an appeal, and we have to consider evidence. So you didn't try to do a report of proceedings? I have factual evidence that I filed in the legal file through the court. Okay. Did you ask for a report of proceedings? I did not. Any other questions? No further questions. Thank you, Mrs. Mann, and thank you, Counsel Rado, for your arguments and presentation this morning in this case. It will be taken under advisement, and a written disposition shall issue. The court will stand in recess until 1.15.